UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANTHONY McCOY,
    *Plaintiff*,

v.

CARON *et al.*,
    *Defendants*.

No. 3:20-cv-1011 (JAM)

**ORDER DISMISSING COMPLAINT PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Anthony McCoy is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983. McCoy alleges that defendants violated his due process rights over the course of a disciplinary hearing and an administrative segregation hearing. After an initial review, I conclude that the claims should be dismissed without prejudice as set forth in the ruling below.

## BACKGROUND

McCoy names fourteen defendants: Warden Caron, Captain Juan Ibes, Lieutenant Ouellette, Correctional Officer Canales, Correctional Officer Clark, Lieutenant Grimaldi, Correctional Officer Leone, Correctional Officer LaPrey, Correctional Officer Cieboter, Correctional Counselor R. Riccio, Correctional Counselor Supervisor E. Tugie, Director of Offender Classification and Population Manager Dave Maiga, District Administrator William Mulligan, and Acting Commissioner Angel Quiros. Acting Commissioner Quiros is named in his official capacity, Manager Maiga and District Administrator Mulligan are named in both their individual and official capacities, and the remaining defendants are named in their individual capacities. Doc. #1 at 1. McCoy asserts that defendants violated his rights under the Eighth and Fourteenth Amendments, and he also brings several state law claims. *Id.* at 2.

1

The following facts are alleged in the complaint and accepted as true for purposes of initial review only. McCoy's due process claims appear to be based on two separate hearings—a disciplinary hearing and an administrative segregation hearing—based on the same conduct.

On April 1, 2020, correctional staff observed that inmates in Building 3 at Carl Robinson Correctional Institution ("Robinson") were protesting various issues at the institution by not accepting their meals. *See* Disciplinary Supplemental Information, Doc. #1 at 14. The intelligence unit began investigating the protests, and correctional officials determined that any inmate found to be orchestrating the meal refusal would be immediately transferred to Northern Correctional Institution ("Northern"). *Ibid.*

On April 3, 2020, under the authority of Warden Caron, Manager Maiga, and Acting Commissioner Quiros, McCoy was transferred from Robinson to Northern without receiving a disciplinary ticket. *Id.* at 4 (¶ 1). McCoy alleges that his transfer was not based on any of the reasons that are set forth in Administrative Directive ("AD") 9 for which a level 2 inmate could be transferred to Northern. *Id.* at 4 (¶¶ 2-3). McCoy also alleges that Lieutenant Ouellette did not provide McCoy with a copy of the Restrictive Housing Unit ("RHU") Status Order at the time of his placement in the RHU, as required under the directive. *Id.* at 4-5 (¶ 3).

Upon his arrival at Northern, McCoy was placed in administrative detention by Lieutenant Jones. *Id.* at 5 (¶ 4). McCoy contends that Lieutenant Jones completed an RHU Status Order even though he is not a correctional officer at Robinson, which was not in accordance with AD 9.4. *Ibid.* McCoy further asserts that his status was not reviewed within 72 hours of his placement in administrative detention, as is required under the directive. *Id.* at 5 (¶ 5).

On April 4, 2020, McCoy received a disciplinary report signed by Lieutenant Ouellette and Correctional Officer Canales. *Id.* at 5 (¶ 6). The report charged McCoy with disorderly

2

conduct for orchestrating a hunger strike which severely interfered with the correctional facility's normal operations. *Id.* at 5-6 (¶ 6). McCoy contends that Correctional Officer Canales created a false report because the term "hunger strike" is not defined or mentioned in the AD and that Lieutenant Ouellette failed to perform his duty to review the report. *Ibid.*

McCoy asserts that while the alleged conduct occurred on April 3, 2020, the supplement to the incident report lists the date of the incident as April 1, 2020, but describes it as taking place on April 3, 2020 in the narrative. *Id.* at 6 (¶ 7). McCoy also states that the disciplinary report was written on April 4, 2020 but was dated April 8, 2020. *Ibid.* McCoy alleges that all of this means that he was given a disciplinary report with no evidence except Captain Ibes's statement. *Ibid.* McCoy further asserts that the disciplinary report was not issued in a timely manner as required under the directive. *Id.* at 6-7 (¶ 7).

Correctional Officers Leone and Cieboter were designated to investigate the incident. *Id.* at 7 (¶ 8). They refused to dismiss the charge despite McCoy's many requests that they do so. *Ibid.* McCoy also requested video footage of the incident that would allegedly prove his innocence. *Ibid.* No footage was provided, although the synopsis of the footage given to McCoy stated that he was not visible on the surveillance footage. *Ibid.* McCoy asserts that the footage was not preserved, in violation of the AD, and that Correctional Officer Leone was biased and "purposely suppressed evidence." *Id.* at 7-8 (¶ 8).

McCoy asserts that under the AD, the investigators are required to interview witnesses requested by the inmate. *Id.* at 8 (¶ 9). Correctional Officer Leone delegated this duty to Correctional Officer Clark at Robinson. *Ibid.* McCoy was initially told that his requests were denied due to lack of supporting information, as Correctional Officer Leone only sent the requested witnesses' last names to Correctional Officer Clark. *Id.* at 8-9 (¶ 9). Correctional

Officer Leone then sent the first names to Correctional Officer Clark, who reported that all of the requested witnesses had been discharged. *Id.* at 9 (¶ 9). McCoy asserts that his mother and his wife looked up all three of his requested witnesses and learned that they had not been discharged. *Ibid.*

Lieutenant Grimaldi, the disciplinary hearing officer, found McCoy guilty on May 12, 2020, based on Captain Ibes's statement, even after he was made aware of the alleged due process violations. *Id.* at 9 (¶ 10). In the Disciplinary Investigation Report completed by Correctional Officer Leone, the facility recommended "15 days punitive segregation (time served)," "90 days loss of commissary," and "60 forfeiture of risk reduction earned credits" as punishment if McCoy were found guilty. *Id.* at 20. Lieutenant Grimaldi imposed the recommended sanctions and penalties. *Id.* at 25. McCoy asserts that Correctional Officer LaPrey, his advisor at the hearing, failed to assist him as Correctional Officer LaPrey did not provide an advisor statement, did not review video footage or witnesses, did not meet with McCoy, and did not help McCoy prepare a defense. *Id.* at 9 (¶ 11).

McCoy also had another hearing that resulted in his placement in administrative segregation. The letter recommending that McCoy be placed in administrative segregation was issued on April 7, 2020. *Id.* at 10 (¶ 13). McCoy contends that Counselor Supervisor E. Tugie was not the decisionmaker and that McCoy was entitled to present his case to Manager Maiga. *Ibid.* He also disputes that the decision was impartial, as all the information relied upon came from the investigation of the incident at Robinson. *Ibid.* The reasons given for McCoy's placement in administrative segregation were that inmates were seen watching McCoy for direction regarding the food trays; that McCoy was seen running his hand back and forth in front of his neck in a gesture that signified "no," telling the inmates to refuse food trays; that the

4

inmates followed McCoy's instructions; and that a phone review supported this conclusion, making McCoy a "lead orchestrator" of the hunger strike. *Ibid.* McCoy states that he never saw a transcript supporting the accusation against him. *Ibid.*

McCoy's administrative segregation hearing was held on May 13, 2020, and he was found guilty the following week. *Id.* at 10-11 (¶ 14). McCoy asserts that prior to his hearing, his advisor, Counselor T. Blue, failed to meet with him and failed to attend the hearing. *Ibid.* McCoy gave an oral statement at the hearing and asserts that Correctional Counselor R. Riccio added things to his statement that he did not say. *Ibid.* McCoy also contends that he was denied witnesses due to the lack of information provided by McCoy and subsequent facility moves. *Ibid.*

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may

not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Although McCoy references both the Eighth and Fourteenth Amendments as the source of his federal claims in his introductory paragraph, he argues only that he was denied due process in connection with the disciplinary and administrative segregation hearings. The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

As an initial matter, McCoy alleges that he was transferred from Robinson to Northern without receiving a disciplinary ticket. Doc. #1 at 4 (¶ 1). But prison inmates do not generally have a liberty interest against being transferred from one prison facility to another. *See McMahon v. Fischer*, 446 F. App'x 354, 357 (2d Cir. 2011) (citing *Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir. 1998)). Accordingly, McCoy cannot premise his due process claim on the sole fact that he was transferred from Robinson to Northern.

Moreover, in the prison context—involving prisoners whose liberty interests have already been severely restricted because of their confinement—a prisoner plaintiff who complains of adverse action without due process must show that the adverse action amounted to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Thus, in *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not

6

sustain an atypical and significant hardship to constitute a deprivation of a liberty interest that would be subject to protection under the Due Process Clause. *Id.* at 486. The Supreme Court noted as well that disciplinary custody was not atypical because "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Ibid.*

Following *Sandin*, the Second Circuit has explained that the "[f]actors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal citations and quotations omitted). The Second Circuit has further observed that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (*per curiam*). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64-65.

For McCoy's due process claim relating to the disciplinary hearing, Officer Grimaldi imposed 15 days of punitive segregation, running from April 3, 2020 to April 17, 2020. Doc. #1 at 24-25. This period of confinement falls far below the 101-day period length of time that ordinarily may give rise to a liberty interest for the purposes of a due process claim. Moreover, McCoy does not allege facts to show that his conditions of confinement were atypical or substantially more onerous compared to the usual restrictions of imprisonment. *See Galarza v. Erfe*, 2019 WL 121784, at *5 (D. Conn. 2019) (collecting cases). Indeed, in the Restrictive

Status Report of Hearing for Placement or Removal attached to McCoy's complaint, dated May 13, 2020, McCoy's statement notes that on April 3, 2020, he was brought to Northern where "[t]he COs were good to us. We got extra channels, late nights, two free calls. Others spoke of it but I had no problems." Doc. #1 at 31. McCoy does assert that Correctional Counselor Riccio "add[ed] things to [his] statement that [he] did not say," *id.* at 11 (¶ 14), but even if this statement about the conditions at Northern was not made by McCoy, McCoy still fails to put forth any facts in his complaint about the conditions of confinement that indicate they were atypical or substantially more onerous than usual. Accordingly, McCoy has failed to show that he was deprived of a liberty interest for purposes of a due process claim based on the disciplinary hearing and the imposition of punitive segregation.

McCoy also alleges that he was classified to administrative segregation sometime in mid-May 2020, *id.* at 10-11 (¶ 14), and the Restrictive Status Report of Hearing for Placement or Removal indicates that administrative segregation was authorized for McCoy on May 19, 2020, *id.* at 30. McCoy filed this complaint on July 20, 2020, about two months after he was placed in administrative segregation. This period of confinement also falls below the Second Circuit's 101-day guideline. Similar to his disciplinary hearing due process claim, McCoy does not allege that the conditions of administrative segregation in any way rose to the level of atypicality required to demonstrate the deprivation of a liberty interest. McCoy therefore fails to establish a plausible due process claim relating to his placement in administrative segregation.

Finally, while McCoy cites a number of provisions in the DOC's administrative directive that give him certain procedural rights, "[i]t is well-established that a claim that a state official failed to comply with his own agency's directives, policies, or procedures does not demonstrate the deprivation of a constitutionally or federally protected right." *El-Massri v. New Haven Corr.*

*Ctr.*, 2019 WL 3491639, at *10 (D. Conn. 2019). Nor does the administrative directive alone get McCoy to the second step of the Court's procedural due process inquiry. In *Sandin*, the Supreme Court "rejected the idea that a state's establishment of a specific substantive predicate for restrictive confinement of a prisoner is sufficient to create a protected liberty interest." *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999). Indeed, "even where there is allegedly a 'state-created liberty interest' as a result of 'state statutes or regulations [that] require, in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates,' in order for a prisoner's claim to be actionable, the deprivation of 'the liberty interest must [still] subject the prisoner to atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Brown v. Faucher*, 2019 WL 5540983, at *5 (D. Conn. 2019) (quoting *Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010)). Because McCoy has not shown that his punitive segregation as a result of the disciplinary hearing or his placement in administrative segregation were atypical and significant hardships, he has failed to establish that he was deprived of a liberty interest protected by the Due Process Clause.

## CONCLUSION

All federal constitutional claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1). Because there are no facially plausible federal law claims against any of the named defendants, the Court declines to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

The Clerk of Court shall close this case. If McCoy believes that he is able to allege facts that overcome the concerns stated in this ruling and that set forth plausible grounds for relief, then he may file a motion to reopen along with an amended complaint by **December 21, 2020**.

It is so ordered.

Dated at New Haven this 20th day of November 2020.

                                              /s/ *Jeffrey Alker Meyer*
                                              Jeffrey Alker Meyer
                                              United States District Judge